The **O.N. EQUITY SALES COMPANY, Plaintiff,**

v.

**Lonnie L. GIBSON, Defendant.**

No. CIV.A.3:07–0362.

United States District Court, S.D. West Virginia, Huntington Division.

Oct. 1, 2007.

Marion H. Little, Jr., Esq. and Michael R. Reed, Esq., Zeiger, Tigges & Little, LLP, Columbus, OH, for Petitioner O.N. Equity Sales Company.

Joel A. Goodman, Esq., Goodman & Nekvasil, P.A., Clearwater, FL, for Defendant Lonnie Gibson.

## MEMORANDUM OPINION AND ORDER

ROBERT C. CHAMBERS, District Judge.

Pending before this Court are numerous motions by the parties, revolving around the question of arbitrability, including, 1) Plaintiff's Motion for Preliminary Injunction (Doc. 16), 2) Plaintiff's Motion to Consolidate Preliminary Injunction Hearing with Trial on the Merits (Doc. 18), 3) Plaintiff's Motion for an Order Authorizing the Parties to Engage in Immediate Discovery on the Issue of Arbitrability (Doc. 20), 4) Defendant's Motion to Compel Arbitration (Doc. 24), and finally 5) Defendant's Motion for a Protective Order (Doc. 29). For the reasons explained more fully below, the Court **GRANTS** Defendant's motion to compel arbitration, **DENIES** Plaintiff's motion for preliminary injunction, and **DENIES** the parties' other motions as moot.

## BACKGROUND

Plaintiff, O.N. Equity Sales Co. (ONESCO), is a full service securities broker dealer, registered in all 50 states and a member of the National Association of Securities Dealers (NASD). From March 23, 2004 until January 2, 2005, non-party,

Gary Lancaster, was employed as an independent contractor and registered representative of ONESCO. (Aff. of Jeffrey Bley, Attachment 2 to Doc. 16). During this time, Lancaster also served as Chairman, President, and CEO of Lancorp Financial Fund Business Trust (Lancorp). (*See* First Amended Statement of Claim, *Pracht et al. v. O.N. Equity Sales Co,* Case No. 7–948 before the Arbitration Tribunals of the NASD). Lancaster's actions and the failure of Lancorp served as a spark, igniting a firestorm of litigation which includes the motions pending before this Court.

Before he became associated with ONESCO, Lancaster solicited investors to Lancorp by circulating a private placement memorandum. (Pl. Mem. in Support of Motion for Prelim. Inj., Doc. 17). Interested individuals were required to review the Private Placement Memorandum and execute a subscription agreement. (*See* Private Placement Mem.) Pursuant to the Subscription Agreement, the amounts paid by investors were initially deposited in an escrow account and held until the closing date. *Id.* Under the terms of the agreement, investors could not "cancel, terminate or revoke." *Id.* Lancorp, however, could decide in its "sole discretion to terminate the offering ... at any time before the maximum number of 50,000 units" had been sold. *Id.*

The parties disagree about whether Lancaster fully disclosed his involvement with Lancorp to ONESCO. (*Compare* First Decl. of Gary Lancaster *with* Aff. of Jeffery Bley). In his own declaration, Lancaster reported that he informed ONESCO that he had an outside business, Lancorp, on February 14, 2004. (Decl. of Gary Lancaster). He also described a one page disclosure form, sent to him by ONESCO, on which he informed the defendant that he would be starting Lancorp on May 14, 2004. *Id.* He further stated that

ONESCO never asked him about Lancorp, and that he assumed he had permission to sell and offer Lancorp to customers. *Id.* Jeffrey Bley, Vice President of ONESCO, asserted that Lancaster never provided written notice of his involvement with Lancorp, and never asked ONESCO's approval for his participation with Lancorp. (Aff. of Jeffery Bley). A document submitted by ONESCO, however, reveals that ONESCO was at least on notice that Lancaster was associated with Lancorp. (*See* Other Business Disclosure Reporting Page, Attachment 3 to Doc. 16)

After a number of initial investments had been made, Lancorp was forced to make a material alteration in its offering. Due to insurance industry changes, it could not obtain insurance and had to guarantee investments by way of a new bank or broker/dealer obligation. Lancaster circulated a letter to previous investors in April of 2004 asking them to either, 1) confirm their subscriptions and acknowledge the change, or 2) request withdrawal. (*See* Letter from Gary Lancaster, Attachment 3 to Doc. 24). Significantly, this material alteration occurred after Lancaster became associated with ONESCO.

Eventually, Lancorp attracted a sufficient number of investors. The offering became effective on May 14, 2004. (*See* Decl. of Gary Lancaster). Unfortunately, one of Lancorp's first major investments was in MegaFund, a Texas based Ponzi scheme. Because of this bad investment Lancorp failed and eventually went into receivership.

Based upon these facts numerous Lancorp investors filed arbitration actions with the NASD, asserting state and federal claims against ONESCO. ONESCO has responded by filing at least twenty separate actions in federal courts across the country seeking to avoid arbitrating claims with investors. The instant case involves

one such dispute between a Lancorp investor and ONSESCO

Lonnie Gibson, a resident of Huntington, West Virginia, first became involved with Lancorp on June 2, 2003, when he executed a subscription agreement for 6 shares, worth $30,000 in response to the private placement memorandum. (*See* Subscription Agreement, Attachment 5 to Doc. 16). On April 12, 2004, despite the material change in the offering, Gibson confirmed this initial investment. (*See* Letter from Gary Lancaster, Attachment 3 to Doc. 24). A few months later, in September 2004, Gibson made an additional investment of $30,000 in Lancorp. (*See* Attachment 3 to Doc. 24).

ONESCO contends that all of the relevant actions in the dispute with Gibson occurred before Gary Lancaster became associated with ONESCO on March 23, 2004. Gibson on the other hand claims that the claims are properly submitted to arbitration because 1) the initial offering did not become final until May 14, 2004, 2) Gibson renewed the initial investment in response to a material change in the offering in April of 2004, 3) Gibson made a second investment in September of 2004, and 4) proper supervision of Lancaster on the part of ONESCO would have prevented Lancorp's failure.

## ANALYSIS

At the outset it should be noted that at least three courts have already resolved related disputes between Lancorp investors and ONESCO.[1] *See The O.N. Equity Sales Co. v. Steinke,* 2007 WL 2421761 (C.D.Cal. August 27, 2007); *The O.N. Equity Sales Co. v. Pals,* 2007 WL 2506033 (N.D.Iowa Sept.6, 2007); *The O.N. Equity*

*Sales Co. v. Venrick,* 2007 WL 2705859 (W.D.Wash. Sept. 17, 2007). In resolving these actions, each court has come to the same conclusion: The disputes between investors of Lancorp and ONESCO are properly submitted to arbitration. This Court sits in a different jurisdiction, which has not yet ruled on the matter, and though the resolution of the instant case is guided by different precedent, the reasoning as well as the conclusion contained in this opinion are consistent with that of the other courts that have resolved the issue. Despite the numerous motions and volume of documents submitted by the parties, the real dispute can be boiled down to a rather straightforward question—is each investor's dispute covered by the NASD Code of Arbitration Procedure? It seems that in the Southern District of West Virginia, as in the Central District of California, the Northern District of Iowa and the Western District of Washington, it is.

Before reaching the overarching question of arbitrability, however, it is necessary to first determine whether this court is the proper forum to address that issue, and also decide whether discovery on the issue is necessary.

## I. This Court is the Proper Forum to Determine the Question of Arbitrability

The plaintiff in this case argues that the question of whether an agreement to arbitrate exists is for the court to decide. The defendant argues that because the issue of Lancaster's relationship with ONESCO deals with timing, an arbitrator rather than the court should resolve this matter.

---

**1.** Two other courts have partially dealt with similar situations. In *O.N. Equity Sales Co. v. Cui,* Case No. 3:07–cv–02844JSW (N.D.Cal), the court has allowed limited discovery on the issue of arbitrability. In *O.N. Equity Sales*

*Co. v. Scott,* Case No. 4:07–cv–269–RH/WCS (N.D.Fl.) the court has denied discovery while it determines its actions on defendant's motion to compel arbitration.

■ "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (citations omitted). Indeed, courts have held that a party suffers a harm when forced to arbitrate without a contractual obligation to do so. *See e.g. Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2nd Cir.2003); *MONY Sec. Corp. v. Vasquez*, 238 F.Supp.2d 1304, 1308 (M.D.Fla.2002).

■ The question of whether this contractual agreement to arbitrate exists in a given situation (the question of arbitrability) is generally one for the courts to decide. *Virginia Carolina Tools, Inc. v. Int'l. Tool Supply, Inc.*, 984 F.2d 113, 117 (4th Cir.1993) (citing *AT & T Techs. Inc.* at 649, 106 S.Ct. 1415). Parties can agree to arbitrate this question of arbitrability, but such an agreement is at odds with the normal practice, and therefore there exists no presumption to arbitrate this threshold question. *Id.* Consequently, in order for an arbitrator to have jurisdiction over the initial question of arbitrability, the parties must make a clear and unmistakable indication of this intent. *Id.*

In *Howsam v. Dean Witter Reynolds Inc.*, the U.S. Supreme Court made clear that not all "potentially dispositive gateway question[s]" would be questions of arbitrability for a court to decide. 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). The Court noted that disputes about whether parties were bound by an arbitration clause, and disagreements about the applicability of an arbitration clause in a concededly binding contract were questions for the court, but that "procedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator." *Id.* at 84, 123 S.Ct. 588

(internal quotations and citations omitted). The Fourth Circuit Court of Appeals has explained that a court should only intervene "when there is a question regarding whether the parties should be arbitrating at all." *Dockser v. Schwartzberg*, 433 F.3d 421, 426 (4th Cir.2006).

■ Although the instant matter involves some questions as to the timing of key events, these relate directly to the dispute about the applicability of an arbitration clause. The question before this Court, then, is a question about the existence and scope of an agreement to arbitrate, not a procedural issue that grew out of the underlying dispute and happens to bear upon its final decision. The question of whether this dispute is proper for arbitration is one for the Court and not an arbitrator.

## II. The NASD Code of Arbitration Procedure Serves as the Arbitration Agreement Between the Parties

In the case of *Washington Square Sec. Inc. v. Aune*, the Fourth Circuit Court of Appeals addressed a situation with many factual and legal elements consistent with the matter presented to this Court. *See* 385 F.3d 432 (2004). Investors sought to bind Washington Square Securities to arbitration by virtue of the company's membership in the NASD. *Id.* at 433. None of the investors had contracted directly with Washington Square, but rather with Mr. White, an independent agent who was permitted to participate in business opportunities unrelated to Washington Square. *Id.* The transactions investors complained of were solely a product of Mr. White's unrelated business opportunities, of which Washington Square had no knowledge. *Id.* Seeking to avoid arbitration, Washington Square filed suit in federal court seeking a declaratory judgment and preliminary injunction. *Id.* at 434.

The Fourth Circuit first found that "in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Id.* (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 416 (4th Cir. 2000)). Specifically, an NASD member can be bound to arbitrate by the NASD Code. *Id.* The court explained, "[t]he NASD Code constitutes an agreement in writing under the Federal Arbitration Act, 9 U.S.C. § 2, which binds ... an NASD member[ ] to submit an eligible dispute to arbitration upon a customer's demand." *Id.* at 435.

As was the case in *Washington Square,* here, there is no direct agreement between the parties on the issue of arbitrability. An arbitration agreement, if one exists, is to be found within the NASD Code. To determine if the NASD Code serves as a binding agreement, it is necessary to interpret its relevant terms and determine whether they apply to the parties in the case at hand.

### A. The Parties Must Arbitrate if the Relevant NASD Code of Arbitration Procedure Provisions are Susceptible to an Interpretation that Covers Their Dispute

While interpreting the NASD Code, this Court is aware that its role is properly limited to resolving the question of arbitrability, not ruling on the merits of the case. *See AT & T Techs., Inc.* 475 U.S. at 650, 106 S.Ct. 1415 ("The courts, therefore, have no business weighing the merits of the grievance ... determining whether there is particular language in the written instrument that will support the claim.") In interpreting the terms of the NASD Code, proper deference will, therefore, be given to the federal policy favoring arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

This presumption in favor of arbitrability while interpreting the provisions of the NASD Code is in fact mandated by the Fourth Circuit's holding in *Washington Square.* Before beginning its interpretation of the NASD Code as a contract, the Fourth Circuit held that "any ambiguities as to the scope of [Rule 10301] itself must be resolved in favor of arbitration." 385 F.3d at 436 (quoting *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 476, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)) (internal quotations omitted). It went on to explain, "[t]here is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* (quoting *AT & T Techs., Inc.,* 475 U.S. at 650, 106 S.Ct. 1415). Thus, in order to compel arbitration the defendant need not prove definitively that the NASD Code requires the parties to arbitrate, only that the NASD Code is susceptible to an interpretation which would bind the parties to arbitration.

### B. Discovery is Not Necessary to Resolve the Question of Arbitrability

*Washington Square's* holding that the presumption of arbitrability applied to an interpretation of the NASD Code was an application of well established case law limiting a court's involvement with issues going to the merits of a case. *See e.g. AT & T Techs. Inc.,* 475 U.S. at 650, 106 S.Ct. 1415. In resolving the question of arbitrability, a trial court should "avoid enmeshing courts in detailed interpretations of the meanings of provisions that should instead be decided by the arbitrator." *Virginia*

*Sprinkler Co., Inc. v. Road Sprinkler Fitters Local Union No. 669, U.A., AFL–CIO,* 868 F.2d 116, 121 (4th Cir.1989). The value of arbitration may be lost if one side can force expensive discovery through the courts prior to arbitration. *See id.*

In one of its pending motions, ONESCO argues to consolidate a hearing on arbitrability with a trial on the merits. It argues that there are limited factual issues, and but a single legal issue to resolve before final resolution of the case is appropriate. In that motion, ONESCO tells the court that there are so few factual issues for it to investigate that a mere 6–8 weeks between an order from this Court and trial would allow "more than ample preparation time" to perform discovery and get ready for trial. This position reveals that ONESCO does not expect many new facts to come to light during discovery.

This Court agrees with ONESCO that there is but a single legal issue and few, if any, factual issues to resolve before the case could be decided on the merits. Mindful of its role at this stage, however, the court is reluctant to involve itself with the merits of the claim. As such, if the question of arbitrability can be resolved with the documentary evidence now available, the proper course is to do just that.

Largely because of the presumption in favor of arbitrability, there is sufficient documentary evidence to serve as a factual foundation for legal analysis of the NASD Code. First, the statement of amended complaint submitted by the defendants clearly lists many counts capable of supporting a claim of negligent supervision. (*See* First Amended Statement of Claim, *Pracht et al. v. O.N. Equity Sales Co,* Case No. 7–948 before the Arbitration Tribunals of the NASD). Second, according to the face of the Private Placement Memorandum and the Lancorp Subscription Agreement, investments in the company, though irrevocable on the part of the investor, were held in escrow and subject to modification or cancellation by Lancorp until a later closing date. (*See* Private Placement Mem. and Subscription Agreement). According to the sworn testimony of Gary Lancaster, a material change was made to these initial investments in April 2004, and Lancorp did not start up until May 14, 2004. (Decl. of Gary Lancaster). Also, Gary Lancaster stated that he disclosed his involvement in Lancorp to ONESCO, and ONESCO has in fact provided evidence which supports notice of this association. (*See* Decl. of Gary Lanc.; *see also,* Other Business Disclosure Reporting Page). Finally, the defendant has submitted documentary evidence showing that Gibson made a second investment of $30,000 in Lancorp after Lancaster was associated with ONESCO. (*See* Attachment 3 to Doc. 24).

Although it does little to dispute factual submissions by the defendant, in recent filings ONESCO does point to two issues of fact it wants to resolve during discovery. First, it wants to determine exactly who sold Lancorp securities to the investors. Second, Lancorp calls into question the credibility of Lancaster. Because Lancaster was at all times president and CEO of Lancorp, however, this first inquiry would seem to be only collateral to the question of arbitrability. While due process certainly entitles ONESCO to contest the factual claims asserted against it by the defendant, including the ability to challenge Lancaster's credibility, this is precisely the kind of inquiry that is at the heart of the merits of the claim and not necessary for resolution at this stage.

So long as the relevant contract—NASD Code Rule 10301—is susceptible to an interpretation that would bind the parties to arbitration, the appropriate forum for the ultimate settlement of this dispute is before an arbitrator.

## C. The Relevant Provision of the NASD Code is Susceptible to an Interpretation Which Would Bind the Parties to Arbitration

The relevant provision of the NASD Code in *Washington Square* and in the instant case is Rule 10301. It provides,

Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member. and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

NASD Code of Arbitration Procedure, Rule 10301(a).

■ Two conditions must be met for this provision to apply: First, the dispute must be between a customer and a member or person associated with a member. Second, the dispute must have arisen "in connection with the business of such member or in connection with the activities of such associated person." *See, Washington Square Sec., Inc.*, 385 F.3d at 436; *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814 (11th Cir.1993).

### 1. Gibson Was a Customer of ONESCO and/or an Associated Person

■ ONESCO contends that based on *Wheat, First Sec., Inc. v. Green*, Defendant Gibson cannot be considered a its "customer" for the purpose of demanding arbitration. Wheat, First Securities (Wheat) was an NASD member broker-dealer who had purchased certain assets and assumed certain contracts of another broker-dealer, Marhsall Securities, through an asset purchase agreement. *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 815–16. Well before the asset purchase agreement was executed, one of Marshall Securities's agents allegedly had made material misrepresentations in connection with the sale of certain shares. *Id.* Although the asset purchase agreement contained an express waiver of liability, and despite that fact that the complaining investors were not among the contracts Wheat assumed from Marshall, the investors sought to compel Wheat to arbitration. *Id.* Wheat acknowledged that some of the complaining customers had later opened accounts with it, but argued that customer status under NASD Code Rule 10301 should be determined at the time of the of the events serving as the basis for fraud. The Eleventh Circuit Court of Appeals agreed. *Id.* at 820.

ONESCO argues that all of the events upon which the allegations of fraud and misrepresentation are based occurred during the initial offering, before Lancaster was associated with ONESCO. They urge this Court follow the reasoning of *Wheat*, and conclude that because Gibson had no connection with ONESCO at the time of the offering he cannot be considered a customer of ONESCO for the purposes of arbitration. The facts of this case, however, make it difficult to follow the rationale of *Wheat*.

There are. a number of distinguishing facts upon which Gibson's investment and ONESCO's connection are different from Wheat's involvement with Marshall's investors. First, the offering under which Gibson initially invested $30,000 was not immediately effective. Until well after the initial offering, investments were held in escrow, and Lancorp reserved sole discretion to modify, withdraw, cancel, or terminate the offering. According to Gary Lancaster's sworn declaration, this date was after his association with ONESCO. Second, the offering was materially modified on April 2004, again a date when Lancaster was employed by ONESCO. Third,

Gibson has alleged that Lancorp's failure could have been prevented if ONESCO had properly supervised Lancaster. Finally, Gibson made a second investment of $30,000 in Lancorp, during Lancaster's tenure with ONESCO, in September of 2004. Consequently, the present case is not like the situation in *Wheat,* where "[w]ell after the allegedly fraudulent [ ] stock transactions occurred, Wheat First happened upon the scene ..."

The plaintiff cites heavily from two additional cases to support its contention that Gibson cannot be considered a customer of ONESCO—*Hornor, Townsend & Kent, Inc. v. Hamilton,* 2004 WL 2284503 (N.D.Ga. Sept. 30, 2004) and *Gruntal & Co., Inc. v. Steinberg,* 854 F.Supp. 324 (D.N.J.1994). Just as in *Wheat,* however, these cases only involved allegations of wrongdoing that occurred before the NASD member became associated with the person or institution accused of fraud. *See O.N. Equity Sales Co. v. Venrick,* 2007 WL 2705859 (W.D.Wash. Sept. 17, 2007).

The facts in the present case appear to be more like those in *Washington Square,* where an independent agent, while associated with an NASD member, engaged in potentially illegal conduct related to outside business opportunities. In its determination that investors of the agent could be considered customers of the NASD member, the Fourth Circuit relied heavily on the presumption of arbitrability. *See Washington Square Sec.,* 385 F.3d at 436–37. It reasoned that, although the term "customer" in Rule 10301 was ambiguous, in that it could be given either a broad or narrow interpretation, based on the policy favoring arbitrability, so long as the investors could be considered customers under the broad interpretation they should be considered customers entitled to demand

arbitration.[2] *See id.* Because of the many facts linking Gibson to Lancaster during the time he was employed by ONESCO, the term "customer" in Rule 10301 cannot be unambiguously interpreted to exclude Gibson. Consequently, for the purposes of arbitration, Gibson is a customer who has a dispute with ONESCO.

### 2. The Dispute Arose in Connection with the Business Relationship

 In addition to determining the scope of the term "customer" in Rule 10301, the Fourth Circuit in *Washington Square* dealt with the meaning of the phrase "arising in connection with the business of a member." *Washington Square,* 385 F.3d at 437. It held that because the dispute involved Washington Square's supervision of the agent, the phrase was susceptible to an interpretation that covered the investor's dispute. *Id.* As the present dispute similarly involves an allegation of negligent supervision, this Court is bound by that precedent. For the purposes of arbitration, Gibson's dispute arose within the business of NASD member ONESCO.

Because both of the relevant terms in Rule 10301 are susceptible to an interpretation that would compel arbitration, and because of the federal policy favoring arbitrability, resolution of the parties' dispute on the merits should be completed in arbitration.

### CONCLUSION

For the reasons stated above, defendant's Motion to Compel Arbitration is **GRANTED.** For the same reasons, the plaintiff's motion to enjoin arbitration is **DENIED.** The Plaintiff's motions to Consolidate the Preliminary Injunction Hear-

---

2. The *Washington Square* Court pointed that in the NASD Code only "a broker and a dealer" are excluded from the definition of customer. *Id.* at 436 (citing *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48, 59 (2nd Cir.2001)).

ing With the Trial on the Merits, and For an Order Authorizing the Parties to Engage in Immediate Discovery on the Issue of Arbitrability are **DENIED** as moot. The Defendant's Motion for Protective Order is similarly **DENIED** as moot.

Having ordered the parties to arbitration, the Court has resolved finally of all matters submitted to it by the parties. This case is therefore **DISMISSED** from the docket.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties, and to publish it on the website.